UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS P. FITZGERALD,

                Plaintiff,

v.

H&R BLOCK FINANCIAL ADVISORS, INC.,
and H&R BLOCK, INC.,

                Defendants.

_____/

Case No. 08-10784

Honorable David M. Lawson

**DEFENDANTS' RESPONSE TO PLAINTIFF'S APPLICATION
<u>FOR ORDER CONFIRMING ARBITRATION AWARD</u>**

**VERCRUYSSE MURRAY & CALZONE, P.C.**
**Robert M. Vercruysse (P21810)**
**Bernice McReynolds (P44019)**
31780 Telegraph Road, Suite 200
Bingham Farms, MI 48025
(248) 540-8019
**Attorneys for H&R Block, Inc.,**
**and H&R Block Financial Advisors, Inc.**

## **ISSUES PRESENTED**

I.     Whether the Financial Industry Regulatory Authority Dispute Regulation ("FINRA", formerly NASD) Arbitration Panel manifestly disregarded the law in issuing an Arbitration Award that included $3,014,370.50 in compensatory damages, $466,565.62 in interest and $481,910.79 in attorney's fees where it improperly asserted jurisdiction over ERISA claims and awarded damages against the wrong parties.

## CONTROLLING AUTHORITY

*Dawahare v. Spencer,* 210 F.3d 666, 669 (6th Cir.),
  *cert. den.,* 531 U.S. 878 (2000)


9 U.S.C. § 10, Federal Arbitration Act.

This is an action arising out of a February 20, 2008 arbitration award in excess of $3,900,000 that was improperly awarded against H&R Block Financial Advisors, Inc., ("HRBFA") and H&R Block, Inc., ("HRB") in favor of HRBFA's former General Counsel, Thomas Fitzgerald. In the arbitration, Fitzgerald sought damages arising out of stock options and severance benefits that he never received because of his failure to perform conditions precedent. Fitzgerald asserted breach of contract and ERISA claims, as well as various unsupportable state tort theories. A motion was filed in this Court by Fitzgerald, asking the Court to confirm the award. HRBFA and HRB now file this response requesting that the Court deny the application for order confirming the arbitration award.

As a publicly traded company, HRB refused to pay a departing executive over $3,000,000.00 without obtaining an extended non-competition agreement in return. The stockholders deserved no less. Nonetheless, the Arbitration Panel disregarded the interests of the shareholders and awarded approximately $3,900,000.00 to Fitzgerald who had no legal right to those benefits, in manifest disregard of the law.

Moreover, the Arbitration Panel manifestly disregarded the law in entering an award against two parties, HRBFA and HRB, that were not parties to the contract forming the basis of Fitzgerald's claim and were not the ERISA plan and that were not and could not grant stock options through the plan. In addition to ignoring the absence of the indispensible ERISA plan, the Arbitration Panel disregarded Michigan law regarding contracts, improperly asserted jurisdiction over ERISA claims, and awarded attorney fees where no Michigan law provides for such. For the reasons more fully set forth below, the Application confirming the Arbitration Award should be denied.

## STATEMENT OF FACTS

### I.    THE PARTIES

HRB is a holding company whose subsidiaries provide financial and other services. In December 1999, HRB became the indirect parent corporation of OLDE Discount Corporation ("OLDE"). (EX.1; EX.2, Fitz. 553-54) In August 2000, OLDE changed its name to H&R Block Financial Advisors, Inc. ("HRBFA") (EX.2, Fitz. 557-58). HRB and OLDE/HRBFA are separate corporations and are managed by two different Boards of Directors. Fitzgerald is a licensed attorney with over 20 years of legal experience with the Securities Exchange Commission, in private practice and as a General Counsel, who worked for OLDE/HRBFA until April 26, 2004.

### II.   FITZGERALD'S EMPLOYMENT BEFORE HRB ACQUIRED OLDE/HRBFA

Fitzgerald's OLDE employment was "at-will" and could be terminated at any time, with or without cause. (EX.2, Fitz. 729) Fitzgerald's pay was also at the will of his employer. (EX.3) The Personnel Manual provided that "[a]ll wage adjustments are strictly within OLDE's discretion." (EX.4, p. 5) Bonuses were also purely discretionary. (EX.5; EX.2, Fitz. 546, 744-45)   In bonus memos (EX.6) issued to Fitzgerald in 1999 and thereafter, Fitzgerald acknowledged that:

4.  The bonus policy is subject to change without prior notice and any revision or final determination will be made at the sole discretion of the Board of Directors.

5.  The bonus allocation is made at the sole discretion of the Board of Directors....

### III.  FITZGERALD'S EMPLOYMENT AFTER THE ACQUISITION

#### A.    The August 30, 1999 Memorandum

HRB approved the OLDE acquisition on August 30, 1999. The same day, HRB Executive VP and COO, Mark Ernst, gave a forward looking memorandum to certain top level

2

OLDE managers which discussed HRB's "vision" and "objectives" for the period following the acquisition. (EX.1, p. p. 4-5; EX.2, Ernst 441-42) Fitzgerald's copy of the memo noted that Fitzgerald could continue in his present position after the acquisition and that his salary had been "initially targeted" at $300,000. (*Id.*; Fitz. 544-45) Ernst also noted that he anticipated awards of HRB stock options, **pursuant to the Company's standard stock option program,** around the time of the December 1999 closing, and annually for the two years thereafter (EX.1, emph. added):

> 4. H&R Block Stock Options – these would be awarded annually, including an initial grant at or near the date of closing, that would align the interests of the management team with those of H&R Block shareholders. The **H&R Block stock option program** is a fairly industry standard program that grants awards at the grant date market value of H&R Block stock....You will receive an initial grant of 15,000 option shares and would be guaranteed to receive no fewer than 15,000 option shares per year for the following two years.

### B. The H&R Block Long-Term Executive Compensation Stock Plan

The "H&R Block stock option program" cited in the August 30 memo was a reference to, and **incorporated by reference,** the HRB 1993 Long-Term Executive Compensation Plan ("Stock Plan"), *pursuant to which all HRB stock options are awarded.* (EX.7; EX.2, Fitz. 545) Fitzgerald was thus informed in the August 30 memo that stock options would be provided pursuant to HRB's Stock Plan. (EX. 2, Fitz. 545-47)

The Stock Plan gave the Compensation Committee the **unfettered, absolute discretion to set and change terms and conditions for the award of stock options and to determine who receives stock option awards.** (EX.7, emph. added; EX.2, Andrew 848)

> 3. **Administration of the Plan.** The Plan shall be administered by a Compensation Committee...[which] shall have *the full power and authority to construe, interpret and administer the Plan* and...to make determinations which shall be final, conclusive and binding....*The Committee shall impose such additional conditions*

3

*upon the grant and exercise of Awards under this Plan as may from time to time be deemed necessary or advisable*....[and] *may adopt rules and regulations for carrying out the Plan* and written policies for implementation of the Plan. Such policies may include, but need not be limited to, the type, size *and terms of Awards to be made to Recipients and the conditions for payment of such Awards.*

**4. Absolute Discretion.** *The Committee may, in its sole and absolute discretion* (subject to the Committee's power to delegate certain authority in accordance with the second paragraph of Section 4), *at any time and from time to time* during the continuance of the Plan, (i) *determine which employees of the Company shall be granted Awards under the Plan,* (ii) grant to any employee so selected such an Award, (iii) *determine the type, size and terms of Awards* to be granted...(iv) *establish objectives and conditions for receipt of Awards,* (v) *place conditions or restrictions on the payment or exercise of Awards....*

The Plan also "require[d] that a Recipient *be an employee* of the Company *at the time an Award is paid or exercised."* (EX.7, § 12, emph. added)

Finally, the Stock Plan required each recipient of stock option awards to execute a stock option agreement in order to actually receive the award. (EX.2, Andrew 852-53) The *mere receipt* of a stock option agreement was insufficient to create a right to stock options:

**21. Award Contracts.**...No Recipient shall have or acquire any rights under the Plan except such as are evidenced by *a duly executed contract* in the form thus specified [by the Compensation Committee].

(*Id.*, emph. added). (EX.2, Fitz. 742-43) While Fitzgerald *received* certain stock option agreements, he failed to sign them, thereby nullifying any right to awards which he later attempted to assert.

**C.    The December 1, 1999 Stock Option Agreement**

HRB closed on the OLDE acquisition on December 1, 1999. (EX.2, Fitz. 550) The same day, HRB's Compensation Committee issued to Fitzgerald an Executive Compensation Plan Stock Option Agreement ("1999 Stock Option Agreement"), which made him *"eligible* to receive" 15,000 stock options under the Stock Plan, provided that he sign the agreement. (EX-8,

4

emph. added; EX.2, Fitz. 563, 828-30; EX.7, §21)[1] Fitzgerald *accepted* the foregoing condition by *signing* the 1999 Stock Option Agreement, thereby making the grant of stock options subject to the terms and conditions in the 1999 Stock Option Agreement and the incorporated Stock Plan. (*Id.*)

The agreement also provided, pursuant to the authority of the Compensation Committee, that to exercise the options, Fitzgerald had to either be employed by OLDE/HRBFA at the time of the exercise or exercise his options within three months after a termination of his employment. (EX.8, ¶3(b)) *Because Fitzgerald failed to exercise the options under either alternative, he is not entitled to the options under the 1999 grant.*

> ### D.   The June 30, 2000 Stock Option Agreement

The HRB Compensation Committee subsequently approved a second grant, making Fitzgerald eligible to receive 15,000 stock options in June 2000. (EX.9, ¶ 3(a); EX.2, Fitz. 764) Similar to the 1999 agreement, the 2000 Stock Option Agreement contained conditions for the actual receipt and exercise of the options, including requiring that Fitzgerald *sign the agreement* and either *be employed at the time he exercised the options* or exercise the options *within three months of his termination.* (*Id.* at ¶¶ 3(b), 21; EX.2, Fitz. 767) *Fitzgerald refused to sign the agreement.* (*Id.*) Accordingly, since he did not satisfy the conditions in the Stock Plan and the 2000 agreement for receipt of the options, *which included his execution of the agreement* (EX.7, ¶21), *Fitzgerald had no right to stock options under the 2000 grant.*

> ### E.   The Employment Agreement and the 2001 and 2002 Stock Option Grants

In June 2001, HRB approved an Employment Agreement to be entered into with

---

[1]   The options had a strike price of $43.00 and were subject to vest in years 3, 4, and 5 in increments of 40 percent, 30 percent and 30 percent, respectively. (*Id.* at ¶ 3(a))

Fitzgerald and every other senior HRBFA executive. (EX.10; EX.2, Ernst 447) The same month, the Compensation Committee approved a third grant of stock options for select HRBFA employees, with a grant date of June 30, 2001. (EX.2, Ernst 479)

Fitzgerald's Employment Agreement was forwarded to him on October 11, 2001. (*Id.*; EX.10) Other senior executives were provided with an Employment Agreement containing the same general provisions, but with variances in terms of position, compensation and the like. (EXS. 11-17; EX.2, Fitz. 499, 573, 629, 751-52)

On May 20, 2002, Ernst responded to Fitzgerald's two letters. (EX.19; EX. 2, Ernst 492; Fitz. 499) He explained that the non-competition protections were necessary to protect the Company and that similar protections had been included in the Employment Agreements of other senior executives. (*Id.*; EX.2, Ernst 441-42) He further noted that Fitzgerald's non-competition provision had been revised so that he would not be constrained from practicing law. (*Id.*) Fitzgerald refused to sign the agreement, and therefore *was not eligible to receive the 2001 stock option issued pursuant to the Stock Plan and referenced in the Employment Agreement.*

Thereafter, in June 2002, when the Company approved another grant of stock options (a grant *not* referenced in the August 30, 1999 memo), Fitzgerald was not included in the grant. After learning this, Fitzgerald informed Ernst in August 2002 that he was suddenly willing to sign the Employment Agreement, but only if the Company acceded to his demands. Fitzgerald required that the agreement be effective June *2002*, **not** *2001*, as set forth in the agreement, that he receive both the June 2001 **and** the June 2002 stock option awards **and** that there be accelerated vesting of the 2001 stock options upon termination of employment. (EX.20; EX.2, Fitz. 632-33) Ernst rejected the proposal as inconsistent with the Compensation Committee's

6

award of the 2001 and 2002 stock options and the Directors' requirement that the Employment Agreement be effective June 2001, not 2002. (EX.2, Fitz. 654-56)  Fitzgerald accordingly maintained his refusal to sign the agreement and was the only senior executive employee who refused to sign.

**F.**    **The June 30, 2003 Stock Option Grant**

In June 2003, the HRB Compensation Committee authorized a further grant of 10,000 stock options to Fitzgerald, subject to the execution of a Stock Option Agreement.  (EX.21; EX.2, Fitz. 785; Nygaard 128)  Again, *Fitzgerald did not sign agreement and therefore was not entitled to any of these options upon the termination of his employment.*

**G.**    **The June 30, 2003 Restricted Shares Agreement**

On June 30, 2003, the Compensation Committee granted Fitzgerald 1,500 restricted stock options pursuant to HRB's Stock Plan, subject to execution of a Restricted Shares Agreement. (EX.22; EX.2, Fitz. 641)  That agreement called for delivery of the shares in three equal installments beginning on June 30, 2004, *provided that* Fitzgerald was an active employee on each delivery date.  (*Id.* at ¶ 1(b), (c), (d))  Any options not delivered were to be forfeited.  (*Id.*) *Fitzgerald did not sign the Restricted Shares Agreement, nor was he an active employee on June 30, 2004, the first delivery date, or on any subsequent delivery date.  Accordingly, Fitzgerald is not entitled to shares under the Restricted Shares Agreement.*

**IV.**    **TERMINATION AND FAILURE TO INVOKE THE SEVERANCE PLAN**

As a result of HRBFA's desire to restructure its organization and for more direct reporting in Fitzgerald's department, discussions between Nygaard and Fitzgerald over termination of Fitzgerald's employment began in August 2003. (EX. 2, Fitz. 652-54; Nygaard

7

125-26) To give Fitzgerald an opportunity to find alternative employment, HRBFA decided not to immediately demand his resignation or terminate his employment. Fitzgerald, however, *postponed* his termination, apparently hoping to obtain more generous severance benefits than were available under HRB's standard Severance Plan.

In February 2004, after Fitzgerald *still* had not resigned, Nygaard informed him that it was time to end the relationship and, if possible, work out an appropriate severance package. (EX.2, Fitz. 659-61; Nygaard 215-16) Fitzgerald's response was to delay still more, engage in extreme posturing and retain counsel to try to negotiate a more favorable severance package than provided by the Severance Plan. (EX.2, Fitz. 665-66) When no agreement was reached, Fitzgerald was relieved of his duties around March 23, 2004. He was then permitted to remain on the payroll for a period of time while settlement discussions continued through his attorney. (EX.2, Fitz. 679)

In response to Fitzgerald's attorney's written demands under Federal Rule of Evidence and Michigan Rule of Evidence 408 for an exorbitant settlement package, the Company met with counsel and tendered a confidential proposed settlement agreement to Fitzgerald. The proposed agreement contained generous financial terms for Fitzgerald (worth approximately $3,000,000.00), but in return included a longer non-compete period than was normally included in severance agreements issued under the Severance Plan. Fitzgerald, however, refused to sign the proposed agreement.[2] Over objection by HRB and HRBFA, the arbitrators admitted extraneous evidence at the hearing on the settlement negotiations between the parties. (EX.2,

---

[2]    While Fitzgerald attempts to cast the proposed settlement agreement in a negative, coercive light, it was simply a legitimate attempt by Plaintiffs to negotiate a settlement containing terms acceptable to both parties.

Fitz. 800-805)  Without explanation, the Arbitration Award is remarkably close to the amount offered in the confidential settlement negotiations.

Fitzgerald's employment was terminated on April 26, 2004. (EX.2, Andrew 858; Fitz. 708) Upon his termination, Fitzgerald had the option to elect coverage under the Severance Plan in order to obtain certain severance benefits. (EX.23) To receive those benefits, Fitzgerald was required to sign an agreement which released all claims against Plaintiffs, and which contained a non-competition provision. (*Id.* at ¶ 3, ¶ 8(a)) Fitzgerald, however, admitted that he refused to enter into any release agreement that contained a non-competition provision or a release. (EX.2, Fitz. 589) He also refused to sign the release unless he was granted stock options and additional severance benefits that went well beyond those allowed under the Severance Plan. (EX.2, Fitz. 739-743, 817) *Fitzgerald therefore rejected the benefits offered under the Severance Plan.* Fitzgerald also refused to file a claim for benefits within the time allowed under the Severance Plan after he rejected the HRBFA enhanced severance offer of April 26, 2004. (EX.2, Fitz. 692)

## V.   POST-TERMINATION FAILURE TO EXECUTE STOCK OPTIONS

Pursuant to the 1999 Stock Option Agreement, Fitzgerald had three months after his April 26, 2004 termination to exercise awarded options by notifying HRB and tendering payment for the options. (EX.8; EX.2, Fitz. 767) Despite defense counsel having specifically reminded Fitzgerald of this deadline through his attorneys on July 23, 2004, *Fitzgerald failed to mitigate and exercise those options, and the options accordingly expired.*  (EX.24; EX.2, Andrew 857-58)

## VI.   THE ARBITRATION AWARD

As noted in the attached Motion, the parties agreed to submit only Fitzgerald's state-law

9

claims to arbitration.  On February 20, 2008, the Arbitration Panel issued its award. (EX. 37) Without specifying the claims for which it awarded damages or any basis for awarding attorney fees, other than simply asserting, wrongly, that the fees were "pursuant to Michigan statute," the Panel awarded Fitzgerald $3,014,370.50 in compensatory damages, $466,565.62 in interest and $481,910.79 in attorney fees. The Panel did not state any analysis for its liability determination, which claims it evaluated, or its damages calculations. Fitzgerald subsequently filed an action in this Court to confirm the award. Meanwhile, the H&R Block Severance Plan and HRB Management, Inc., the named Plan Administrator and Plan Sponsor, have filed a Motion for a TRO in the U.S. District Court for the Western District of Missouri to enjoin Fitzgerald from confirming the award, Case. No. 07-00637.  (EX.38)

## ARGUMENT

### I.   THE STANDARD OF REVIEW

A court may vacate an arbitration award where: (1) the award was procured by fraud, (2) the arbitrators were evidently partial or corrupt, (3) the arbitrators misbehaved so that a party's rights were prejudiced, or (4) the arbitrators exceeded their powers or executed them so that a final, definite award was not made. *Dawahare v. Spencer,* 210 F.3d 666, 669 (6th Cir.), *cert. den.,* 531 U.S. 878 (2000) (internal citation omitted); *see also* 9 U.S.C. § 10(a) (Federal Arbitration Act ("FAA")). "In addition, a reviewing court may vacate an award where the arbitrators have manifestly disregarded the law." *Id.* The Sixth Circuit has been willing to assume, for sake of argument, "that an arbitrator can exceed his powers in violation of § 10(a)(4) by failing to fulfill his obligations" under the arbitration agreement, but it is not necessary for the arbitrator to go so far as to completely "overstep[] the bounds of his authority." *Green v. Ameritech*, 200 F.3d 967,

975 n.6 (6th Cir. 2000). As stated in the labor context, arbitrators are confined to interpreting the arbitration agreement and governing law; they do "not sit to dispense [their] own brand of industrial justice." *United Stlwrkrs of Am. v. Enter. Wheel,* 363 U.S. 593, 597 (1960).

Applying Michigan law, the Michigan Supreme Court has held that "where it clearly appears on the face of the award or the reasons for the decision as stated, being substantially a part of the award, that the arbitrators through an error in law have been led to a wrong conclusion, and that, but for such error, a substantially different award must have been made, the award and decision will be set aside." *DAIIE v. Gavin*, 416 Mich. 407, 434 (1982).

## II.    **THE BREACH OF CONTRACT CLAIM**

Fitzgerald claims that HRB breached its contractual agreements with him by failing to provide him with (1) stock options for 1999, 2000 and 2001 that were allegedly "guaranteed" in Ernst's August 30, 1999 memorandum, (2) stock options in 2002, (3) 2004 short-term incentive compensation, and (4) benefits pursuant to HRB's Severance Plan. These claims have no merit, and the Arbitration Panel manifestly disregarded the law in awarding damages on them.

### A.    **Fitzgerald is Not Entitled to Stock Options for 1999, 2000 and 2001 Under the August 30, 1999 Memorandum**

Fitzgerald's claim that he is entitled to stock options for 1999, 2000 and 2001 is based entirely on Ernst's August 30, 1999 memorandum. The Arbitration Panel manifestly disregarded Michigan law to the extent that it based its award on the August 30 memorandum.

Under Michigan law, it is well-settled that unambiguous contract terms are to be enforced as written and that a court is without authority to impose additional terms or rewrite the contract of the parties. As held by the Michigan Supreme Court in *Rory v Continental*:

[U]nless a contract provision violates law or one of the traditional defenses to the

11

enforceability of a contact applies, a court must construe and apply unambiguous contract provisions as written....[T]he judiciary is without authority to modify unambiguous contracts or to rebalance the contractual equities struck by the contracting parties.

473 Mich. 457, 461 (2005). *See also Burkhardt v. Bailey,* 260 Mich. App. 636, 656 (2004).

### 1.    The August 30, 1999 memorandum did not alter Fitzgerald's at-will employment or compensation

Fitzgerald was an at-will employee whose employment *and compensation* were at the discretion of HRBFA. (EX.2, Fitz. 729, 772; EX.25; EX.4, pp. 5, 8) The August 30, 1999 memorandum did not change that employment relationship. (EX.1)  To change the at-will nature of his employment, he was required to have a written contract signed by OLDE's President and witnessed by a senior executive of OLDE.  (EX.2, Fitz. 729-30; EX.4)  The August 30 memo clearly did not satisfy these criteria.

Notably, HRB's Board of Directors approved an *actual* employment agreement in 2001, which Fitzgerald refused to sign.  (EX.2, Fitz. 747; EX.10; EX.18; EX.2, Ernst 502)  As a result, *no Employment Agreement was ever reached with Fitzgerald, and his employment and compensation remained at the will of HRBFA.  See, Pakideh v. Franklin Commercial Mortgage,* 213 Mich. App. 636, 640 (1995) ("Before a contract can be completed, there must be an offer and acceptance. Unless an acceptance is unambiguous and in strict conformance with the offer, no contract is formed."); *Blackburne & Brown v. Ziomek,* 264 Mich. App. 615 (2004) (offer lapsed and no contract was formed because Plaintiff failed to sign and return a loan approval letter by the expiration date of the offer).

### 2.    The August 30, 1999 memo expressly incorporated the Stock Plan

The August 30, 1999 memo cannot be construed as an enforceable, integrated contract or "retention agreement" *because it incorporated by reference another document addressing stock*

12

*options.* The August 30 memo specifically states that the options would be issued under HRB's stock option program (referred to herein as the "Stock Plan"). (EX.1, p. 5) Additionally, the 1999 Stock Option Agreement that was later presented to *and signed by Fitzgerald* upon the closing of the OLDE acquisition *specifically referenced and incorporated the Stock Plan.* (EX.8) *Forge v. Smith,* 458 Mich. 198, 207 (1998) ("Where one writing references another instrument for additional contract terms, the two writings should be read together."); *Whittlesey v. Herbrand Co.,* 217 Mich. 625, 628 (1922).

Fitzgerald, an experienced attorney, also knew that any options would be awarded through the Stock Plan, which provides the Compensation Committee with discretion to set terms and conditions for award of options. (EX.2, Fitz. 738-39) Discussing the August 30, 1999 memorandum, Fitzgerald testified:

> **Q** **So you knew that there had to be another document, a program that affected the**
> **stock options, didn't you?**
> **A** **Yes.**     (EX.2, Fitz. 739)

Further, the Stock Plan clearly provided that the Compensation Committee had *"sole and absolute discretion" to dictate the terms under which stock options would be awarded and to "establish objectives and conditions for the receipt of Awards."* (EX.7; emph. added) (EX.2, Fitz. 740-42) Except for the 1999 stock option award, for which Fitzgerald executed a Stock Option Agreement (EX.8), *Fitzgerald never executed, and therefore never accepted, any options offered to him* pursuant to the terms and conditions established by the Compensation Committee. Every other executive testified that thye had accepted the options by signing the requested agreement. (EX.2, Andrew 844-45 , Ernst  463, and Nagaard 235)

In *Stack v. K-Mart Corp.,* 1996 WL 33348776 (Mich. App.) (EX.26), the plaintiff

claimed entitlement to stock options which the defendant had denied him after he was convicted of mail fraud, a conviction that was later reversed on appeal. The options were denied based on an Incentive Stock Option Plan that granted the defendant's compensation committee the authority to terminate options if it determined that fraud was "committed by an optionee at any time" during the optionee's employment. (*Id.* at *1) In the plaintiff's stock option agreements, he agreed to be bound by the Incentive Stock Option Plan, just as Fitzgerald agreed to be bound by the HRB Stock Plan when he signed his Stock Option Agreement in 1999. (EX.8) The Michigan Court of Appeals rejected the plaintiff's stock option claim because the compensation committee had "the discretionary power to determine whether to deny plaintiff stock options based on fraud, regardless of whether it incorrectly determined that the plaintiff had actually engaged in fraud. (*Id.* at *2) Similarly here, the Compensation Committee had the authority under the Stock Plan to establish conditions for the issuance of stock options *and exercised that authority through the requirements that option recipients sign Stock Option Agreements and that key executives sign employment agreements.*

### 3.    Fitzgerald was offered, but failed to accept, stock options

HRB and HRBFA complied with the objectives for stock options grants outlined in the August 30 memo, which merely addressed *what* Fitzgerald would receive in terms of stock options, not the conditions for *how* those options would be issued. Fitzgerald was offered 15,000 stock option shares in 1999 and 2000 and 30,000 stock option shares (based on a stock split) in 2001. (EXS.8-10) However, in all three cases, Fitzgerald was required to **sign** the option agreements in order to **accept** the options. (EX.2, Fitz. 742-43) Fitzgerald willingly did so with respect to the 1999 Stock Option Agreement, but then failed to do so for the 2000 Stock Option

14

Agreement. (EXS.8-9)[3] He therefore chose not to accept the 2000 stock option award.

As for the June 2001 award of stock options to Fitzgerald, the Compensation Committee conditioned the award, as was its right pursuant to the Stock Plan, on the execution of an Employment Agreement. (EX.10) Fitzgerald admits that the committee had "authority to…establish objectives and conditions for the receipt of awards." (EX.2, Fitz. 741, 748) He further admits that he could "get [the] 2001 stock options if [he] signed the employment agreement" and that by asking him to sign the agreement, HRB and HRBFA were not asking him "to do anything that was illegal or unlawful." (EX.2, Fitz. 748, 750) Unlike other senior executives at HRB and its subsidiaries, however, Fitzgerald *refused* to agree to these terms. (EX.2, Fitz. 754)

### B.    Fitzgerald is Not Entitled to an Award of Options for 2002

The August 30, 1999 memorandum does not reference any stock options for 2002. (EX.1) Fitzgerald nonetheless claims an entitlement to stock options for 2002 under the theory that HRB retaliated against him for refusing to enter into an Employment Agreement by failing to award him options in 2002. Fitzgerald, however, failed to provide any authority supporting such a claim. He did not allege or prove that HRB violated any statute or took any action against him because he refused to violate a law or because he exercised any rights under a statute. *Vaghts v. Perry Drugs Stores, Inc,* 204 Mich. App. 481, 484-85 (1994). Accordingly, the Arbitration Panel manifestly disregarded the law in awarding damages based on this claim.

### C.    Fitzgerald is not Entitled to STI Compensation for 2004

Fitzgerald also claims entitlement to short-term incentive compensation under the H&R

---

[3]    As noted previously, Fitzgerald ultimately failed to comply with the terms of the 1999 Stock Option Agreement in exercising the 1999 options upon his termination.

Block Financial Advisors Senior Management Short-Term Incentive Program for Fiscal Year 2004 ("STI Plan", EX.27). Pursuant to the express terms of the plan, however, "[i]n order to receive an incentive award...a Participant *must be employed by a subsidiary of the Company on April 30, 2004."* (*Id.*, p. 2; emph. added) In addition, the amount of the compensation to be awarded under the plan *was discretionary*. (*Id.*, p. 1) As Fitzgerald concedes, his employment was terminated *prior* to April 30, 2004. (EX.2, Fitz. 679) He therefore was not eligible for STI Plan compensation. Any award based on STI Compensation was a manifest disregard of the law.

## III.   THE ERISA CLAIMS

Fitzgerald asserts three separate claims for benefits under the Severance Plan: (1) a direct claim for benefits, (2) a breach of fiduciary duty claim and (3) an interference or discrimination claim. All three claims are brought pursuant to ERISA, 29 U.S.C. § 1001, *et seq*. *Both HRB and HRBFA objected to the arbitration panel hearing these claims*, and the panel was repeatedly made aware that the relevant parties for such claims were not parties to the arbitration. *(*EX.2, 72-73*)* Further, as discussed below, none of Fitzgerald's ERISA claims have merit and all three claims should have been dismissed in their entirety. The decision of the Panel—which incorrectly stated that the Plan and the Plan Administrator were present and represented by this Firm at the Arbitration when they were not—shows a manifest disregard of the law

### A.   FITZGERALD FAILED TO SATISFY ELIGIBILITY AND EXHAUSTION REQUIREMENTS UNDER THE SEVERANCE PLAN

Even if the ERISA claims were properly before the Arbitration Panel, the Panel disregarded the law on ERISA. All of Fitzgerald's ERISA claims fail at the outset because he was not eligible for benefits under the Severance Plan, did not make a claim under the Severance Plan and did not exhaust his administrative remedies under the Severance Plan.

### 1.   Fitzgerald was Ineligible for Benefits Under the Severance Plan

To receive benefits under the Severance Plan, Fitzgerald was required by the Plan to sign a release with a non-compete provision which released all claims against Plaintiffs. (EX.23, §3, § 8(a) and §2(m)). An employee who fails to sign such a release is not a "Participant" under the Severance Plan. (EX.23, §2(h)). Fitzgerald admits that he would not sign a general release tendered by HRBFA because he was unwilling to give up his claim to the 2001 options. (EX.2, Fitz. 806-08, 817)  Because Fitzgerald would not sign a general release, and so informed the Company, he was not a Participant, and was not eligible for severance benefits, under the Plan.

### 2.   Fitzgerald Failed to Exhaust his Administrative Remedies

An individual must exhaust all administrative remedies in an ERISA plan prior to bringing a claim for benefits in court or arbitration. *Burds v. Union Pac.,* 223 F.3d 814, 817 (6th Cir. 2000) (requiring exhaustion of remedies in § 510 claim); *Miller v. Metro. Life*, 925 F.2d 979, 986 (6th Cir. 1991) ("ERISA requires participant to exhaust his administrative remedies prior to commencing suit"); *Baxter v. C.A. Muer*, 941 F.2d 451, 454 (6th Cir. 1991) (dismissing benefits claim due to failure to exhaust administrative remedies). There is no dispute that, because Fitzgerald failed to execute a release, he was a non-Participant under the Plan. (EX.2, Fitz. 817)

The administrative remedies which Fitzgerald was required to follow as a non-Participant are set forth in §11 of the Severance Plan. (EX.23, §11) Those individuals who are not Participants, but nevertheless believe that they are entitled to benefits under the Severance Plan (referred to by §11 of the plan as "Claimants"), must submit a ***written claim for benefits*** to ***the Plan Administrator***, HRB Management, Inc.  (EX.23, §11) (emph. added) (EX.2, Fitz. 808; Ernst 470)  The plan further states that the "Plan Administrator" is HRB Management, Inc.

17

(EX.23, § 2(k))

Fitzgerald never submitted a written claim for benefits to HRB Management, the Plan Administrator, choosing instead to sue each in arbitration. Those claims were dismissed by FINRA because the parties were not subject to an arbitration agreement. Recognizing this failure, Fitzgerald argued that his settlement negotiations with HRB and HRBFA were in reality a claim for benefits under the Plan. This argument is meritless, and evidence of such negotiations should not have been heard under FRE and MRE 408.

**B.     THE 502(a)(1)(B) DIRECT CLAIM FOR BENEFITS HAS NO MERIT**

**1.     HRB and HRBFA are Not Proper Parties to the 502(a)(1)(B) Claim**

The arbitration panel should have dismissed Fitzgerald's direct claim for benefits because HRB and HRBFA are not proper parties to the claim. ERISA §1132(d)(1) provides that an ERISA plan is an entity with standing to sue and be sued, and §1132(d)(2) provides that "(a)ny money judgment under this subchapter against an employee benefit plan shall be enforceable *only against the plan as a entity and shall not be enforceable against any other person*...." (emph. added). *See, May v. Roadway Express, Inc.*, 813 F. Supp. 1280, 1286 (E.D. Mich. 1993) (benefit plan is a separate legal entity and any judgment against a plan is enforceable only against the plan as a legal entity). A direct claim for benefits under an ERISA plan is properly brought against the plan itself (here, the Severance Plan) and/or the plan administrator (here, HRB Management, Inc.), and not against the employer or any other party. *See, e.g., Gore v. El Paso Energy Disability Plan,* 477 F.3d 833, 842 (6th Cir. 2007) (citation omitted) (noting the general rule that an employer "is not a proper party defendant in an action concerning benefits."); *May,* 813 F. Supp. at 1286 (E.D. Mich. 1993) (action for benefits dismissed against employer

18

who was not plan administrator because employer was not a proper defendant); *Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir. 1988) (citation omitted), *cert. denied,* 488 U.S. 826 (1988).

The Award, by its nature, is based upon the ERISA claims brought by Fitzgerald. Fitzerald necessarily understood that he needed the ERISA Plan and/or Plan Administrator to bring the ERISA claims because he previously filed a Petition to Compel Arbitration in this Court, asking that the federal court compel the Plan and the Plan administrator to arbitrate Fitzgerald's claims before the NASD Panel. Despite the fact that this Court ruled that the Plan and Plan Administrator could not be compelled to arbitration because they were not NASD members, Fitzgerald submitted the ERISA claims to the Panel. The resulting Award issued in the absence of the Plan and/or Plan Administrator is, therefore, in manifest disregard of the law.

Neither of the Plaintiffs is the Plan Administrator or a Plan fiduciary under the terms of the Severance Plan and ERISA. The Severance Plan is administered by HRB Management. (EX.23, p. A-3; EX.2, Page Closing 920; Fitz. 760, 809). Claims for benefits under the plan must be submitted to HRB Management, and that entity, as the Plan Administrator, evaluates all claims for benefits. (*Id.*, p. A-9-10). As the Plan Administrator, HRB Management has the sole "power and discretion to construe the provisions of the Plan and to determine all questions relating to the eligibility of employees" to become Participants in the Plan, and the benefits to which they may be entitled. (*Id.*, p. A-9) HRBFA's only role in the Severance Plan is that of a "Participating Employer," and its sole function is to fund the benefits determined by the Plan Administrator. (*Id.*, p. A-3, A-10) Neither Plaintiff administers or manages any aspect of the Severance Plan. Fitzgerald chose, at his own peril, to proceed to arbitrate the ERISA claims in the absence of the Plan and the Plan Administrator. The decision of the Panel—which

19

incorrectly stated that the Plan and the Plan Administrator were present and represented by this Firm at the Arbitration when they were not—shows a manifest disregard of the law and the Award should, therefore be vacated.

### 2.      The 502(a)(1)(B) Claim Belongs in Federal Court, Not in Arbitration

Fitzgerald's 502(a)(1)(B) direct claim for benefits should have been brought in federal court, and not in an arbitral forum, because the proper parties to the claim, the Severance Plan and HRB Management, are not NASD or NYSE members and therefore cannot be compelled to submit to this arbitration process.  As Judge Gerald Rosen held in his July 2006 Order denying Fitzgerald's motion to compel the Severance Plan and HRB Management to submit to arbitration, those entities could not be compelled to arbitrate his claims because they were not NASD or NYSE members. (EX.28, p. 12) The court concluded:

> (W)hile having to litigate his claims in two different forums may be less preferable to Fitzgerald than the opportunity to arbitrate all of his claims in one forum, his preference for ease of litigation cannot be permitted to expand his right to arbitration.  (*Id.* at p.17)

Faced with this ruling, Fitzgerald elected to proceed in arbitration without the Severance Plan and HRB Management. The Plan and HRB Management then initiated an action in the Western District of Missouri seeking an injunction and/or declaratory relief to prevent Fitzgerald from pursuing his 502(a)(1)(B) claim in their absence. Judge Sachs declined to issue injunctive relief in advance of the arbitration hearing, but instead indicated in his Order that he intended to let "the arbitrators have the first bite," suggesting that he resisted taking action for that reason. (EX.29, p. 2) As discussed above, the only proper ruling by the Arbitration Panel was to dismiss the 502(a)(1)(B) claim against HRB and HRBFA.  Its failure to do so was a manifest disregard of the law.

### 3.     Fitzgerald Cannot Carry His Burden of Proof on the 502(a)(1)(B) Claim

#### a.     There was no denial of benefits owed under the severance plan

The Arbitration Panel likewise disregarded the law in evaluating Fitzgerald's claim for

benefits. ERISA §502(a)(1)(B) provides a cause of action for *the denial of benefits*. 29 U.S.C. §

1132(a)(1)(B). Here, there is no evidence that either Plaintiff denied Fitzgerald benefits under the

Severance Plan because, as discussed above, Fitzgerald never made a claim for benefits under

the Plan. Nevertheless, even if Fitzgerald had made a proper claim for benefits, which he did not,

he cannot show that Plaintiffs denied him benefits actually owed him under the plan.

The benefits Fitzgerald sought have always been tied to his demand for benefits to which

he was *not* entitled, such as the 2001 Stock Options grant:

> Q. (By Mr. Vercruysse) So are you saying now that you were willing to waive your
> 2001 options and exercise a general release?
> A. No.

(EX.2, Fitz. 807-08)    Fitzgerald, however, was not entitled to the 2001 stock options, as

discussed *supra*, because he never signed the stock option agreement. Further, to be eligible for

plan benefits, Fitzgerald had to sign a release, also discussed, *supra,* which he refused to do. *Id.*

#### b.     The arbitrary and capricious standard of review

Even if Fitzgerald could show that HRB or HRBFA denied a claim for benefits under the

Severance Plan, which he cannot, he still cannot prevail on his 502(a)(1)(B) claim. Where a

claim for benefits has been denied under an ERISA plan, review of the denial is *de novo*, "***unless***

the benefit plan gives the administrator or fiduciary discretionary authority to determine

eligibility or to construe the terms of the plan." *Firestone Tire and Rubber v. Bruch,* 489 U.S.

101 (1989) (emph. added). Where such discretionary authority has been granted, as in this case,

the panel may only "review the trustees' actions to determine only if they were arbitrary and capricious." *Abbott v. Pipefitters,* 94 F.3d 236, 240 (6th Cir. 1996), *cert. den.,* 117 S.Ct. 948 (1997), citing *Firestone,* at 115; *Whisman v. Robbins,* 55 F.3d 1140, 1143 (6th Cir. 1995). To avoid liability for denial of benefits, the challenged determination need only be *rational* in light of the plan's provisions. *Abbott,* at 240. This standard "is *the least demanding form of judicial review* of administrative action….When it is possible to offer a *reasoned explanation*, based on the evidence, for a particular outcome, *that outcome is not arbitrary or capricious.*" *Id.* (citing *Perry v. United*, 64 F.3d 238, 242 (6th Cir. 1995)) (emph. added).

HRB and HRBFA proffered a "reasonable explanation" for Fitzgerald's failure to receive benefits under the Severance Plan. *Abbott,* 94 F.3d at 240 (6th Cir. 1996). Fitzgerald repeatedly refused to sign a general release unless he received a severance package that included benefits not allowed under the Plan, such as the 2001 stock options. (EX.2, Fitz. 765) Fitzgerald refused to sign a general release as required by the Severance Plan. (EX.2, Fitz. 817) Since he refused to sign a release for only Plan benefits, he was not eligible for severance benefits under the Plan. Further, Fitzgerald cannot show that this interpretation is arbitrary and capricious. *Abbott,* 94 F.3d at 240 (6th Cir. 1996); (EX.2, Hylton 349) Since Fitzgerald cannot prove that HRB or HRBFA acted in an arbitrary and capricious manner, Fitzgerald's § 502(a)(1)(B) claim fails. *Abbott, supra* at 240.

## C.   THE 502(a)(2) BREACH OF FIDUCIARY DUTY CLAIM IS MERITLESS

The Arbitration Panel likewise disregarded the law with regard to Fitzgerald's breach of fiduciary duty claim. ERISA §502(a)(2), along with §1109(a), provides a cause of action against a fiduciary "who breaches any of the responsibilities, obligations, or duties imposed…(for) any

22

losses to the plan resulting from each such breach." 29 U.S.C. §1109(a). An ERISA fiduciary must perform its fiduciary actions with "care, skill, prudence, and diligence...[and] in accordance with the documents and instruments governing the plan." *Pipefitters Local 636 v. BCBS of Mich.*, 213 Fed. Appx. 473, 475 (2007) (EX.30). In reviewing such a claim, the question is whether "the plaintiff has set forth sufficient allegations that such a [fiduciary] duty existed and that it was breached." *Id.* The burden of proving that Plaintiffs acted as a fiduciaries with respect to Fitzgerald's claims, and that the fiduciary duty was breached, rests with Fitzgerald.

The "[o]nly actions" which are "subject to fiduciary standards" are those "respecting the *administration* or *management* of plan assets." *Akers v. Palmer*, 71 F.3d 226, 230 (6th Cir. 1995) (emph. added); *Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir.) ("[U]nless an employer is shown to control administration of a plan, it is not a proper party defendant in an action concerning benefits"). As set forth above, neither HRB or HRBFA controlled administration or management of the Severance Plan. The Arbitration Panel manifestly disregarded the law in imposing liability upon them for breach of fiduciary duty.

**D.     THE 502(a)(3) INTERFERENCE/DISCRIMINATION CLAIM IS MERITLESS**

The Arbitration Panel also manifestly disregarded the law in evaluating Fitzgerald's §502(a)(3) interference or discrimination claim. ERISA §510 provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary... *for the purpose of interfering* with the attainment of any right to which such participant may become entitled under (an employee benefit plan)."

29 U.S.C. §1140 (emph. added). This provision addresses two types of conduct: (1) "interference with the attainment of a right under ERISA" and (2) discrimination in the form of

23

retaliation "because a participant availed himself of an ERISA right." *Coomer v. Bethesda Hosp.,* 370 F.3d 499, 506 (6th Cir. 2004). Notably, §510 "is *not* designed to require employers to treat all persons under the base-statute's protections alike, but simply to prevent employers from using economic leverage to discourage" participants or beneficiaries from availing themselves of a right under ERISA. *Mattei v. Mattei*, 126 F.3d 794, 805 (6th Cir. 1997).

### 1.    The Statute of Limitations Bars § 510 Claims Asserted by Fitzgerald

To the extent that Fitzgerald bases his §510 claim on conduct taking place more than three years prior to the filing of his NASD action on May 2, 2005, his claim is barred by the three-year statute of limitations applicable to §510 claims in Michigan.   As explained in *Alexander v. Bosch Automotive,* 232 Fed. Appx. 491, 494 (6th Cir. 2007):

> Because ERISA § 510 does not provide its own statute of limitations, we apply the limitations period for the most analogous state law claim. *See DelCostello v. Int'l Bhd. Of Teamsters,* 462 U.S. 151, 158 (1983) . . . . ERISA § 510 claims are most analogous to "state employment discrimination or wrongful termination claims."

*Id.* The statute of limitations for employment discrimination claims under the Michigan Elliott-Larsen Civil Rights Act is three years. *Mair v. Consumers Power*, 419 Mich. 74 (1984).

Fitzgerald bases his §510 claim, in part, on conduct that took place more than three years before May 2, 2005.  He alleges that HRB and HRBFA violated §510 by (1) including, in October 2001 and January 2002, a non-compete provision in his proposed Employment Agreement that was different from the non-compete provision in the Employment Agreements of certain other employees[4] and (2) conditioning the grant of the 2001 stock options on the

---

[4]    Fitzgerald ignores the fact that other employees, such as HRBFA attorney Dave Andrew and President and COO Mark Ernst, were given the same 2-year line of business non-compete provision that he was given. (EX.2, Andrew 842-844, 849, 905; EX.11) (EX.2, Ernst 458; EX.6)

signing of the Employment Agreement. Both claims are barred because the alleged incidents took place more than three years before Fitzgerald filed his May 2, 2005 action with the NASD.

### 2.    Fitzgerald Cannot Prove a *Prima Facie* § 510 Interference or Discrimination

#### a.    There is no direct evidence of § 510 interference or discrimination

Fitzgerald did not present direct evidence of interference or discrimination to support his §510 claim. Direct evidence is that "which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough,* 176 F.3d 921, 926 (6th Cir. 1999). It "does not require a factfinder to draw inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice." *Johnson v. Kroger,* 319 F.3d 858, 865 (6th Cir. 2003). The evidence "must demonstrate that 'decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'" *Anderson v. Consol. Rail,* 297 F.3d 242, 248 (3d Cir. 2002).

Fitzgerald produced no direct evidence that HRB or HRBFA took any action against him in order to interfere with his attainment of severance benefits. Nygaard's June 8, 2004 letter to the NASD (EX.31), in which Nygaard states that "[t]he principle reasons for the decision to restructure the management of HRBFA, by eliminating Mr. Fitzgerald's position, were to reduce costs, and to remove a level of management that I deemed unnecessary", certainly is not evidence of intent to deny Fitzgerald ERISA benefits. Not every measure taken by an employer to reduce its costs is evidence of a §510 violation. *See Daughtrey v. Honeywell,* 3 F.3d 1488, 1492 (11th Cir. 1993) (§510 case holding that general measures taken by employer to reduce costs, "that also result in an incidental reduction in benefit expenses do not suggest

discriminatory intent."); *May v. Shuttle, Inc.,* 129 F.3d 165, 171 (D.C.Cir.1997) ("[T]he undisputed evidence shows that [Defendant] furloughed plaintiff in order to cut costs…Plaintiff has presented no evidence to show that [Defendant] was motivated by any other factor. Because plaintiff cannot show a specific intent to discriminate, [he] has failed to establish a prima facie case."). "Instead, the employee must introduce evidence suggesting that the employer's decision was directed at ERISA rights in particular." *Daughtrey*, *supra.* Fitzgerald has not done so.

### b.    There is no circumstantial evidence of § 510 violation

Fitzgerald likewise failed to establish a circumstantial violation of §510. Such a *prima facie* case under §510 may be made by showing "the existence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Majewski v. Automatic Data Processing*, 274 F.3d 1106, 1113 (6th Cir. 2001); *Smith v. Ameritech,* 129 F.3d 857, 865 (6th Cir. 1997). In addition, he must show "a **causal link** between [ERISA] benefits and the adverse employment decision." *Smith, supra* at 865 (emph. added). Finally, he "must come forward with evidence from which a reasonable [fact finder] could find that" HRB and HRBFA had a "**desire** to avoid [benefits] liability" *and* that that desire "was a **determining factor** in" HRB's and HRBFA's conduct. *Smith*, *supra* at 865 (emph. added); *see also Majewski*, 274 F.3d at 1114.

Thus, a claimant does *not* state a *prima facie* case of §510 interference if he demonstrates "only that he lost the opportunity to accrue new benefits." *Majewski, at* 1113; *see also*, *West v. Butler,* 621 F.2d 240, 245 (6th Cir. 1980). Rather, he must also show that his employer "had the **specific intent of** *avoiding* **ERISA liability** when it discharged him. Otherwise, every employee discharged by a company with an ERISA plan would have a claim

under §510." *Id.* (emph. added); *see also Hammon v. DHL Airways,* 165 F.3d 441, 452 (6th Cir. 1999) (emph. added) ("Given that Plaintiff offered no proof that [his employer] encouraged him to resign or accepted his resignation *in order* **to prevent him from making a claim** for employee benefits,…Plaintiff failed to present sufficient evidence to make a prima facie case under ERISA"); *Abbott v. Pipefitters Benefit Plan,* 94 F.3d 236, 242 (6th Cir. 1996), *cert. denied,* 519 U.S. 1111 (1997) (emph. added) ("A 510 plaintiff *must* demonstrate that the action at issue was taken with the specific intent to violate ERISA, i.e., that a motivating factor in the defendant's action *was the purpose of interfering* with the plaintiff's entitlement to benefits.").

Fitzgerald argues that HRB and HRBFA violated §510 by (1) including a non-compete provision in his proposed Employment Agreement that was different from the non-compete provision in the agreements of certain other employees, (2) conditioning the grant of the 2001 stock options on the signing of the Employment Agreement, (3) allegedly terminating Fitzgerald's employment for his refusal to sign the Employment Agreement and (4) tendering a proposed Settlement Agreement that included a different non-compete provision than was tendered to other employees and which failed to include the grant of the 2001 stock options. Fitzgerald failed, however, to establish how any of the alleged conduct violated §510.

### 3.    Fitzgerald Cannot Show Intent to Interfere with Benefits Rights

Fitzgerald presented no evidence that HRB or HRBFA specifically intended to deprive him of ERISA benefits when they tendered the proposed Settlement Agreement containing a non-competition provision that was allegedly different from non-competition provisions provided to other employees. Rather, HRB and HRBFA tendered the Settlement Agreement to Fitzgerald in response to an unacceptable settlement demand from Fitzgerald's attorney, in an

attempt to compromise the parties' disagreement and to avoid costly arbitration proceedings. This is hardly evidence of motivation to avoid liability for severance benefits. *See Owens v. Storehouse,* 984 F.2d 394, 398 (11th Cir.1993) (510 "does not broadly forbid all forms of discrimination" in employment benefits, but only discrimination "designed to retaliate for the exercise of a right or to interfere with the attainment of an entitled right."). *See also, Coomer v. Bethesda Hosp., Inc.,* 370 F.3d 499 (6th Cir. 1004) ("A plan sponsor's amendment of a plan to benefit one individual and its refusal to amend the plan to benefit another individual are not the kinds of discrimination prohibited by § 510"); *Baize v. Philip Morris Inc.,* 120 Fed. Appx. 576 (6th Cir. 2004) (The employer "was not obligated to expand its benefits to any group of employees. The fact that it chose to do so (for employees) with a certain level of seniority certainly does not indicate a desire to avoid pension liability as to employees who had not attained such seniority."); *Varhola v. Doe,* 820 F.2d 809, 816 (6th Cir. 1987) (no evidence that the employer "deliberately discriminated against [the plaintiffs] for the purpose of interfering with their rights" to benefits by denying them benefits that other employees were afforded).

In *McGath v. Auto-Body North Shore,* 7 F.3d 665 (7th Cir.1993), the plaintiff alleged that his employer interfered with his pension rights, in violation of § 510, by bending the plan's eligibility requirements to allow other employees entry, while he was held to the exacting letter of the plan's terms. The court held that even if the allegations were true, § 510 could not provide the plaintiff relief simply because  others were treated more favorably than he. *Id.* at 668-70.

> <u>Because the plan must be administered according to its terms, he cannot complain because he is held to those terms; this is true even if the rules were bent for another individual.</u> ERISA § 510 affords protection from discrimination that interferes "with the attainment of any right to which such participant may become entitled under the plan." Mr. McGath does not have a *right* to treatment that is contrary to the terms of the plan, even if those terms are breached for others. *Id.* (emph. added).

Similarly, in *Haberern v. Kaupp Pension Plan,* 24 F.3d 1491 (3rd Cir.1994), the plaintiff alleged that the employer's amendment to an ERISA plan that eliminated life insurance benefits for individuals over age 56, a change affecting only him, and the simultaneous tripling of the face amount of the life insurance policies for two other employees, violated 510. *Id.* at 1502. The court disagreed, holding that although §510 "prohibits discrimination against a plan participant for the purpose of interfering with the attainment of plan rights, it does not prohibit plan amendments which affect only one person." 24 F.3d at 1502.

Further, the evidence establishes that Fitzgerald was, in fact, ***not*** the only employee who was tendered the non-compete provision complained of in this case. The non-compete clauses contained in the Employment Agreements of HRBFA attorney Dave Andrew and President and COO of H & R Block Management, Mark Ernst were also 2 year line of business provisions. (EX.12; EX.2, Andrew 849; EX.6; EX.2, Ernst 458)   The Arbitration Panel accordingly manifestly disregarded the law to the extent that if found that HRB or HRBFA took any action with the specific intent to deprive him of ERISA benefits.

### 4.    Fitzgerald Suffered No Adverse Action

Fitzgerald's allegation that HRB and HRBFA failed to provide him with benefits under the Severance Plan is also not actionable because "(a)n employee does not have a 'right' to treatment that is contrary to the terms of the plan." *McGath*, 7 F.3d at 670. *See also Coomer*, 370 F.3d at 509 (same). Fitzgerald had no "right" to benefits under the Severance Plan. As noted *supra*, an employee must satisfy eligibility and exhaustion requirements in order to be eligible for benefits under the Plan. The Severance Plan does not allow employees to receive benefits unless those requirements are met. Therefore, even if Fitzgerald did produce evidence

29

in support of his *prima facie* case, which he did not, HRB's and HRBFA's conduct did not impact any "right" to severance benefits because he was ineligible for benefits due to failure to satisfy the eligibility and exhaustion requirements of the Plan.  Fitzgerald therefore did not suffer any adverse action.

### 5.   Fitzgerald Cannot Establish Pretext

Fitzgerald also failed to produce any evidence that HRB's or HRBFA's articulated reasons for their actions were pretext for discrimination. "If the plaintiff states a prima facie case under 510, the employer can rebut the presumption of impermissible action raised by the prima facie case by introducing 'evidence of a legitimate, nondiscriminatory reason for its challenged action.'" *Smith,* 129 F.3d at 865 (quoting *Humphreys v. Bellaire,* 966 F.2d 1037, 1043 (6th Cir.1992)). This shifts the burden back to the plaintiff to show that the proffered reason was mere pretext by proving that "the interference was a motivating factor in the employer's actions or prove that the employer's proffered reason is unworthy of credence." *Smith,* 129 F.3d at 865. "Summary judgment is appropriate if plaintiff fails to establish a prima facie case or fails to rebut the employer's proffer of a legitimate, nondiscriminatory reason for its actions." *Id.*

The Sixth Circuit has expressly held that a plaintiff cannot establish pretext by showing cost savings to the employer alone: "It is obvious that benefit costs make up a large amount of the costs of an employee to a company, and the pension rights are a substantial component of benefit costs, but these undeniable propositions are not sufficient standing alone to prove the requisite intent by the path of pretext." *Humphreys, supra,* at 1044; *Morabito v. Master Builders,* 1997 WL 668955, *3 (6th Cir. 1997)("mere fact that [employer] sought to save money cannot show pretext.")  (EX.32)

Fitzgerald has no evidence that "interference," with the specific intent to deprive him of ERISA benefits, was actually the motivating factor in HRB's and HRBFA's actions, or that their proffered reasons for their actions are unworthy of credence. (Ex.2, Hylton 380) To the contrary, the irrefutable evidence demonstrates that they went out of their way to treat Fitzgerald fairly when it gave him an extended period to find new employment and negotiate a generous settlement package which would be acceptable to all parties. Fitzgerald has no evidence of pretext.

**6.**    **Section 510 Does Not Provide the Remedy Fitzgerald Seeks**

Even if Fitzgerald could establish a §510 claim of interference, the award entered by the Arbitration Panel is not an available remedy for such a violation. "Section 502(a)(3) of ERISA provides the plan participant with his exclusive remedies for a §510 violation." *Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246, 1247 (10th Cir. 2004); *see also Schwartz v. Gregori*, 45 F.3d 1017, 1020 (6th Cir. 1995) (§502(a)(3) governs relief available for §510 violation).

Under §502(a)(3), a participant may bring a civil action "to obtain other appropriate *equitable* relief." 29 U.S.C. § 1132(a)(3) (emph. added). The United States Supreme Court has noted that "equitable relief" as used in this context "must mean *something* less than *all* relief." *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 258, n. 8 (1993). More specifically, the Court has held "that the term 'equitable relief' in §502(a)(3) must refer to "those categories of relief that were *typically* available in equity.'" *Great-West Life & Annuity v. Knudson*, 534 U.S. 204, 210 (2002) (emph. in orig.); *Mertens v. Hewitt*, 508 U.S. 248, 256 (1993). "Money damages are, of course, the classic form of *legal* relief." *Great-West*, 534 U.S. at 210 (emph. in orig).

The Sixth Circuit recently examined the contours of equitable relief in the context of a

31

conceded § 510 violation in *Alexander v. Bosch Automotive*, 232 Fed. Appx. 491 (6th Cir. 2007) (EX.33). The court held that although the employer conceded §510, the equitable remedy of restitution was not available for the violation because the plaintiffs could not "identify particular and traceable funds." *Id.* at 501. The court also held that while the plaintiffs sought to order Bosch to pay funds to reimburse them for the value of plant closure benefits, that remedy constituted *legal* relief that is not available for the violation. *Id.* In sum, the court held that, although the employer conceded §510 liability, the plaintiffs were left without any remedy to reimburse them for the value of the alleged lost benefits. *See also, Helfrich v. PNC Bank,* 267 F.3d 477, 483 (6th Cir. 2001) (citation omitted) (ERISA does not permit an individual beneficiary bringing suit under §510 to obtain for himself money damages from plan fiduciaries).

Here, as in *Alexander*, §510 does not supply a remedy.  Fitzgerald cannot obtain the value of the benefits he seeks directly from HRB and HRBFA because such a remedy is a legal one, unavailable in a § 510 claim.  Thus, even if Fitzgerald could maintain a §510 claim – which they could not – the Arbitration Panel manifestly disregarded the law in awarding money damages.

### III.  THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Given the weakness of Fitzgerald's breach of express contract claims, he repeatedly asserts that HRB and HRBFA violated an "implied warranty of good faith and fair dealing." Michigan law, however, does not recognize a cause of action for alleged breach of an implied covenant of good faith and fair dealing in the employment context. *Hammond v. United Of Oakland,* 193 Mich. App. 146, 152 (1992).  Accordingly, this claim is without merit.

32

## IV.   FITZGERALD FAILED TO STATE A CLAIM FOR "CIVIL EXTORTION"

Fitzgerald's claim for "civil extortion" under MCL 750.213 of Michigan's Penal Code is frivolous and should have been dismissed. The Michigan courts have clearly held that a claim of a failure to perform contractual obligations cannot form the basis for a civil extortion claim. *Fleming v. Xerox Connect, Inc.*, 50 Fed. Appx. 211, 213-14 (6th Cir. 2002) (EX.34) ("It is a contracting party's private economic decision to risk liability for breach of contract" and such "conduct does not come close to extortion."); *Various Market v. Chase Manhattan Bank,* 908 F. Supp. 459, 468 (E.D. Mich. 1995) (Creditor's threat to collect debt by filing litigation that would financially destroy debtor and his family was not extortion.  Read so broadly, every demand letter would constitute extortion).  Accordingly, the extortion claim is frivolous.

## V.   FITZGERALD FAILED TO STATE A CLAIM FOR FRAUD

Fitzgerald's claim that HRB's failure to provide "guaranteed" stock options constitutes fraud is also frivolous and fails under Michigan law. To establish fraud, "the allegedly false statements must relate to past or existing facts, not to future promises or expectations." *Cook v. Little Caesar Enterprises*, 210 F.3d 653, 658 (6th Cir. 2000).  *See also, Two Men and a Truck v. Two Men and a Truck*, 955 F. Supp. 784, 785 n. 1 (W.D. Mich. 1997); *Haque Travel Agency, Inc. v. Travel Agents Int'l,* 808 F. Supp. 569, 572 (E.D. Mich. 1992).  As held by the Michigan Supreme Court, "an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. *Future promises are contractual and do not constitute fraud.*" *Hi-Way Motor v. Int'l Harvester*, 398 Mich. 330, 336 (1976) (emph. added).

## VI.   FITZGERALD FAILED TO EXERCISE HIS AWARDED STOCK OPTIONS

The **only** stock options that were accepted by Fitzgerald were the options awarded in

December 1999. (EX.8)  Pursuant to the 1999 Stock Option Agreement, Fitzgerald had three months after the termination of his employment to timely exercise the options. (*Id.*) Notwithstanding being reminded of this deadline through counsel (EXS. 24, 35-36), Fitzgerald failed to exercise the options. Accordingly, pursuant to the terms of the 1999 Stock Option Agreement, the options expired. As to the other offered stock options, even if Fitzgerald had accepted the proffered options, there is no reason to believe that he would have timely exercised the options since he failed to do so with regard to the December, 1999 options.  The Arbitration Panel therefore manifestly disregarded the law in awarding any damages on these options.

## VII.   **THE PANEL IMPROPERLY GRANTED ATTORNEY FEES TO FITZGERALD**

That portion of the Award that grants attorney fees to Fitzgerald should also be set aside because it improperly awarded attorney fees in the amount of $481,910.79 to Fitzgerald based on an unidentified and nonexistent statute.  Under Michigan attorney fees generally are not recoverable from the losing party as costs in the absence of an exception set forth in a statute or court rule expressly authorizing such an award. *Haliw v. Sterling Hts.,* 471 Mich. 700, 706 (2005); MCL 600.2405(6). Here There was simply no basis for awarding attorney fees.

Moreover, the fees awarded were grossly excessive.  The fees and costs were attributable to three separate law firms which Fitzgerald retained, and sought recovery of $450 dollars per hour for the time of the senior attorney, Ms. Eisenberg, and $300 dollars per hour for the time of the junior attorney, Ms. Haddad.  These amounts are unreasonably high for attorneys practicing in the Detroit area, especially when those fees were incurred four years ago in 2004.

Likewise the fees charged by the Driggers, Schultz firm cannot be awarded based on the scant information provided.  There is no explanation of the number of hours worked, the hourly

34

rate used to arrive at the total fees, or the identity of the attorney(s) who worked on the case.

The fee information provided by the Page Perry firm, an un-itemized total of attorney fees allegedly incurred, is similarly insufficient. Nowhere do the records identify the positions, experience levels or the hourly rates the individuals whose initials appear in the billing records.

## CONCLUSION AND REQUEST FOR RELIEF

For all of the foregoing reasons, HRB and HRBFA request that the Application for Order Confirming the Arbitration Award be denied.

VERCRUYSSE MURRAY & CALZONE, P.C.

By:   /s Robert M. Vercruysse
**Robert M. Vercruysse (P21810)**
**Rvercruysse@vmclaw.com**
**Bernice McReynolds (P44019)**
Attorneys for H&R Block, Inc.,
and H&R Block Financial Advisors, Inc.
31780 Telegraph Road, Suite 200
Bingham Farms, MI  48025
Dated: March 10, 2008            (248) 540-8019

35

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2008, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:   Patrice S. Arend  , and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:  none.

**VERCRUYSSE MURRAY & CALZONE, P.C.**

By:    /s Robert M. Vercruysse
          **Robert M. Vercruysse (P21810)**
          **Rvercruysse@vmclaw.com**
          **Bernice McReynolds (P44019)**
Attorneys for H&R Block, Inc.,
and H&R Block Financial Advisors, Inc.
31780 Telegraph Road, Suite 200
Bingham Farms, MI  48025
(248) 540-8019

Dated: March 10, 2008